**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X   Case No. 17-cv-0179 (DRH)(AYS)
MICHAL KAPLAN,

                Plaintiff,        **AMENDED COMPLAINT**

       - against -

HOFSTRA UNIVERSITY,        **PLAINTIFF DEMANDS**
                                                                          **A TRIAL BY JURY**

                Defendant.
---------------------------------------------------------------X

      Plaintiff Michal Kaplan, by her attorneys, Phillips & Associates, Attorneys at Law, PLLC, hereby complains of the Defendant, Hofstra University, and alleges as follows:

## NATURE OF THE CASE

      1.    This is an action for unlawful discrimination (sexual harassment and quid pro quo harassment) and retaliation under Title IX of the United States Education Amendments of 1972, 20 U.S.C. § 1681 *et seq* ("Title IX"), and for Negligent Retention and Negligent Supervision under New York law.  The Plaintiff, a female student at Hofstra University and a member of the University's tennis team, was subjected to unwelcome and unwarranted sexual harassment from her male tennis coach, Jeffrey Menaker.  After rejecting Menaker's sexual advances, the Plaintiff was immediately subjected to adverse actions by her harasser.  The Plaintiff complained of the harassment to the University, and was then subjected to further retaliation.  By this action Plaintiff demands all remedies available in law and equity.  Plaintiff demands a trial by Jury.

**JURISDICTION AND VENUE**

2. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States.

3. This Court has venue over this action pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

4. This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because the Plaintiff's federal and state law claims derive from a common nucleus of operative facts and form part of the same case or controversy under Article III of the United State Constitution.

**PARTIES**

5. Plaintiff **Michal Kaplan** ("Kaplan") is a citizen of Ontario, Canada. She is an undergraduate student at Hofstra University. During the school year, Plaintiff resides in Hempstead, NY, on the campus of Hofstra University. Plaintiff is female.

6. Defendant **Hofstra University** ("Hofstra" or "the University") is a private college located at 1000 Fulton Avenue, Hempstead, NY 11549.

7. Hofstra receives Federal Financial Assistance within the meaning of Title IX.

**FACTUAL ALLEGATIONS**

8. Plaintiff began her freshman year at Hofstra in September 2015. She was 18 years old at the time.

9. Hofstra participates in Division 1 Athletics through the National Collegiate Athletic Association ("NCAA") and maintains male and female tennis teams.

10. Plaintiff was recruited to play tennis for Hofstra by Hofstra's former tennis coach, Lauren Leo. Plaintiff was awarded a scholarship at 80% of her tuition in part to play tennis for the

2

University. Ms. Leo promised Plaintiff that Plaintiff's scholarship would increase to 100% of her tuition after Plaintiff's freshman year.

11. Upon arriving on campus for the beginning of her freshman year, Plaintiff was filled with the excitement and nervousness experienced by thousands of new college freshman throughout the country every year. Plaintiff was excited to meet her new tennis teammates and participate in the sport that she had loved since she was a child.

12. Unfortunately, everything changed when Ms. Leo left the University, and Jeffrey Menaker was hired to be the new tennis coach for both the men's and women's teams. From the moment he was hired, Mr. Menaker began to engage in a pattern of unlawful, degrading, and humiliating sexual harassment towards Plaintiff.

13. In or around January 2016, Mr. Menaker "friended" Plaintiff on Facebook. While Plaintiff found this odd, at the time she did not give the action much thought.

14. Subsequently, Plaintiff posted a picture on Facebook of herself standing in front of the large red "LOVE" statue in New York City. At 12:30 a.m. on Valentine's Day, Mr. Menaker commented on the picture on Facebook, stating, "looks like you found what you were hunting for in that jacket" and added a winking emoji face icon at the end of his comment. This unwarranted and unwelcome comment made Plaintiff feel degraded and uneasy.

15. Mr. Menaker then suddenly took on an odd obsession with Plaintiff's menstrual cycle. Mr. Menaker repeatedly made comments to Plaintiff and her teammates about when Plaintiff was getting her period. On one such occasion, Mr. Menaker commented to one of Plaintiff's teammates that the Plaintiff seemed "sluggish" at practice and that "it must be because she is on her period" because "she is supposed to be getting it around this time." These comments by Mr. Menaker left Plaintiff feeling extremely uncomfortable, anxious, and violated.

16. Not satisfied with just talking about Plaintiff's menstrual cycle, Mr. Menaker also began to comment on Plaintiff's appearance. Mr. Menaker told Plaintiff and the other female students that when they are out in public they must "shave their legs and dress nice."

17. Upon information and belief, administration officials at Hofstra were aware of the sexual comments being made by Mr. Menaker. However, nothing was ever done by the University to protect their students from such conduct.

18. During a tennis tournament in the Spring of 2016 between Hofstra and Coppin State, Mr. Menaker stated to Plaintiff that one of the female players on the other team "winked at him." He then exclaimed to Plaintiff that the female player was "good looking." These comments by Mr. Menaker about the physical appearance of another female tennis student-athlete heightened Plaintiff's anxiety towards Mr. Menaker.

19. At a subsequent tennis tournament against The University of Delaware, Mr. Menaker began to scream obscenities and verbal harassment at a female player on the opposing team. Mr. Menaker's conduct towards this female player was so disturbing that the parent of the player called Jeffrey Hathaway, Vice President and Director of Athletics at Hofstra, to complain about Mr. Menaker's conduct towards female players. However, once again no action was taken by the University to correct Mr. Menaker's behavior.

20. In or around late March 2016, Plaintiff spoke with Mr. Menaker about increasing her scholarship amount to 100% as former coach Leo had promised her. Mr. Menaker responded that Plaintiff was having an extremely successful season, and that nobody deserved the scholarship increase more than her. Mr. Menaker promised Plaintiff that her scholarship would be increased for her sophomore year.

4

21. However, things ultimately came to a head on or about April 6, 2016 when Mr. Menaker sent a private Facebook message to Plaintiff which contained a YouTube video titled "Casually Explained: Is She Into You?" This 2 minute 31 second video features various cartoon depictions of increasingly sexual situations while a narrator describes how to tell if a girl is "into you" in these different situations. The video starts by describing whether a girl who "looks at you at a bar" is "into you" and then becomes more graphic. The video next describes a scenario of physical touching in the workplace, and the narrator again asks if this would mean that a girl is "into you." The video moves on to a scenario where a male and a female are exercising in the same gym and the female winks at the male. Again, the video deliberates whether the "girl is into the guy" in this situation. The video then goes into the scenario of two friends talking about their last few "dates." Finally, the video talks about a scenario where a woman invites a man "upstairs, dims the lights, rips off her clothes, and you start having sex," and includes a cartoon depiction of two people having sex. The video finally ends stating that you can't tell if the woman having sex is "into" the man because "she might be Canadian and just be being polite."

22. Mr. Menaker sent Plaintiff a comment with the video in which he stated, "Last part is the best. Maybe she's from Canada! I fell off my chair."

23. Plaintiff is from Canada.

24. Mr. Menaker sent this video and message to Plaintiff shortly after their conversation regarding her scholarship.

25. Plaintiff felt extremely offended, humiliated, and frightened upon receiving this video. It was clear to Plaintiff that Mr. Menaker was asking Plaintiff if she was "into him." Furthermore, Mr. Menaker made a direct correlation between the woman in the video, who was having sex with the male narrator, being Canadian, and Plaintiff being Canadian.

26. Plaintiff and Mr. Menaker had never casually exchanged videos or other types of media prior to Mr. Menaker sending this video.

27. After receiving the video, Plaintiff attempted to remain cordial around Mr. Menaker, but she did not reciprocate his obvious sexual advances.

28. Roughly one week after sending Plaintiff this video, Mr. Menaker's behavior towards Plaintiff completely changed.

29. Prior to sending Plaintiff this video, Mr. Menaker never threatened Plaintiff's scholarship or position on the team.

30. However, after Plaintiff did not give into Mr. Menaker's advances, Mr. Menaker suddenly began exclaiming that he was going to "get girls" that were "better than her." Mr. Menaker then also began telling Plaintiff that he was no longer going to increase her scholarship. Nothing had changed in between the time when Mr. Menaker stated he would increase her scholarship to the time when he stated he would not increase it except his sending Plaintiff the video and her not acquiescing.

31. Not satisfied with simply threatening Plaintiff's position on the team and her promised scholarship increase, Mr. Menaker then began to tell Plaintiff that her entire scholarship for the following year was now in doubt, and that he was going to place her on a lower position on the team.

32. Statistically, during the 2015-2016 school year, Plaintiff was one of the top two players on the tennis team. There was no legitimate, non-discriminatory reason why she would be threatened with being moved to a lower position on the team.

33. Mr. Menaker had the authority to remove Plaintiff from the tennis team. Mr. Menaker had the authority to affect Plaintiff's positioning on the tennis team. Upon information

6

and belief, Mr. Menaker had the authority to raise, lower, or eliminate Plaintiff's athletic scholarship.

34. Mr. Menaker's hostile treatment shortly after sending the harassing video was directed solely at Plaintiff. No other female students suddenly had their team position or scholarship threatened.

35. Mr. Menaker's conduct constituted unlawful quid pro quo harassment.

36. Plaintiff became so distraught by the harassment that she considered transferring schools, and went so far as to begin filling out transfer applications. However, Mr. Menaker purposefully delayed processing Plaintiff's Kaplan's transfer request, such that by the time it was completed Plaintiff no was no longer within the window of time allowable to transfer to another school's athletic program. Upon information and belief, Mr. Menaker delayed Plaintiff's transfer request for no other reason than to retaliate against her for refusing his sexual advances.

37. In or about late July 2016, Plaintiff notified Hofstra of the sexual harassment to which she had been subjected to by Mr. Menaker. Hofstra, through General Counsel Jennifer Mone and Title IX Coordinator Lara Nochomovitz, acknowledged receiving Plaintiff's complaint.

38. Upon information and belief, both Ms. Mone and Ms. Nochomovitz had the authority to institute corrective measures on behalf of the University.

39. Upon information and belief, Mr. Menaker was made aware by Hofstra of Plaintiff's complaints and that Hofstra would be conducting an investigation into Plaintiff's complaints.

40. Mr. Menaker then began to retaliate against Plaintiff by contacting various student-athletes on both the men's and women's tennis teams and telling them of Plaintiff's complaint, and then telling them that Plaintiff was a liar, that Plaintiff was only looking for a scholarship, and

other derogatory comments about Plaintiff. These actions by Mr. Menaker were done maliciously and solely in retaliation for Plaintiff's Title IX complaints.

41. Mr. Menaker then also began contacting Plaintiff's Kaplan's teammates and asking them if they had been in touch with Plaintiff. Mr. Menaker asked one of Plaintiff's teammates if she had "spoken to a lawyer."

42. Plaintiff made Hofstra officials, including Ms. Mone, aware of Mr. Menaker's retaliatory conduct.

43. Throughout August and September 2016, various members of the tennis team approached Plaintiff and asked her "what was going on" with her and Mr. Menaker. Plaintiff did not tell any teammates or any other students about the complaints she had made, as she had wanted them to be confidential. Upon information and belief, Mr. Menaker told various students and team members that Plaintiff had made a complaint against him.

44. Various teammates of Plaintiff began to ostracize her after hearing these comments by Mr. Menaker, as, upon information and belief, they feared interacting with Plaintiff would cause Mr. Menaker to retaliate against them as well. This caused Plaintiff emotional anguish, and severely limited her ability to fully participate in and enjoy her collegiate experience.

45. Hofstra failed to adequately protect Plaintiff from retaliation after she made her Title IX complaint.

46. Hofstra continued to employ Mr. Menaker for a period of time despite notice of both his sexual harassment and retaliatory conduct. During this time, Plaintiff was forced to suffer continued acts of retaliation and harassment by Mr. Menaker.

47. In or around September 7, 2016, Hofstra terminated Mr. Menaker.

48. On September 7, 2016, Mr. Hathaway held a meeting with the tennis teams and stated that Mr. Menaker had "decided to leave." This fabrication would have been innocuous had Mr. Menaker kept Plaintiff's complaint confidential. However, upon information and belief, Mr. Hathaway's lie as to Mr. Menaker's termination caused various students to believe the University discredited Plaintiff's allegations. This caused various teammates of Plaintiff to treat Plaintiff less well than they had prior to Mr. Menaker's termination.

49. The retaliatory acts by Mr. Menaker, including spreading lies to various students about Plaintiff and her complaint, continues to cause harm to Plaintiff. Various members of the tennis team have ostracized her, given her dirty looks, and refused to act in a cordial manner around her. As a direct result of Mr. Menaker's retaliatory acts, Plaintiff's ability to equally enjoy Hofstra's academic, athletic, and social activities has been severely compromised.

50. The unlawful actions by Defendant so undermined Plaintiff's experience as a member of the tennis team that the conduct denied Plaintiff equal access to enjoy institutional opportunities.

51. The sexual harassment that Defendant subjected Plaintiff to created a hostile environment.

52. Defendant's unlawful actions have caused Plaintiff economic harm as well as immense emotional harm. Plaintiff has suffered from anxiety, depression, lack of sleep, and crying spells due solely to the unlawful harassment and retaliation she has been forced to endure.

**FIRST CAUSE OF ACTION**
**HOSTILE ENVIRONMENT UNDER TITLE IX**

53. Plaintiff repeats and realleges each paragraph above.

54. Hofstra University receives federal financial assistance within the meaning of Title IX.

55. Title IX states, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…"

56. Jeffrey Menaker was employed by Hofstra University during the 2015-2016 academic year, until his termination in September 2016.

57. As alleged herein, Mr. Menaker subjected Plaintiff to unlawful sexual harassment.

58. The sexual harassment by Mr. Menaker was severe and pervasive.

59. As alleged herein, Hofstra knew or should have known of the sexual harassment.

60. As alleged herein, Hofstra failed to take immediate and appropriate steps to stop the harassment and prevent it from occurring again.

61. As a result of Defendant's unlawful conduct, Plaintiff has suffered both economic and emotional harm.

## SECOND CAUSE OF ACTION
## QUID PRO QUO HARASSMENT UNDER TITLE IX

62. Plaintiff repeats and realleges each paragraph above.

63. Title IX prohibits institutions from subjecting students to quid pro quo sexual harassment.

64. At all relevant times, Jeffery Menaker was employed by Hofstra.

65. As alleged herein, Mr. Menaker subjected Plaintiff to quid pro quo sexual harassment.

66. As a result of Defendant's quid pro quo harassment, Plaintiff has suffered economic and emotional harm.

## THIRD CAUSE OF ACTION
## RETALIATION UNDER TITLE IX

67. Plaintiff repeats and realleges each paragraph above.

68. Title IX prohibits institutions from retaliating against students who engage in activity protected by the statute.

69. As alleged herein, Plaintiff engaged in protected activity.

70. As alleged herein, Defendant had knowledge of Plaintiff's protected activity.

71. As alleged herein, Plaintiff was retaliated against because of her participation in protected activity.

72. As a result of Defendant's unlawful retaliation, Plaintiff has suffered adverse institution-related actions.

73. As a result of Defendant's unlawful conduct, Plaintiff has suffered monetary and non-monetary damages to which she entitled to relief under the law.

## FOURTH CAUSE OF ACTION
## NEGLIGENT SUPERVISION

74. Plaintiff repeats and realleges each paragraph above.

75. Hofstra University and Jeffrey Menaker maintained an employer-employee relationship during Mr. Menaker's tenure as tennis coach at Hofstra.

76. As alleged herein, Hofstra knew or should have known of Mr. Menaker's unlawful conduct.

77. As alleged herein, Hofstra knew or should have known that Mr. Menaker's conduct would cause harm to Plaintiff.

78. Mr. Menaker's unlawful conduct occurred during the course of, and within the scope of, his employment with Hofstra.

79. As a result of Defendant's negligent supervision of Mr. Menaker, Plaintiff suffered harms including extreme emotional distress.

## FIFTH CAUSE OF ACTION
## NEGLIGENT RETENTION

80. Plaintiff repeats and realleges each paragraph above.

81. At all relevant times, Hofstra University and Jeffrey Menaker maintained an employer-employee relationship.

82. As alleged herein, Hofstra was aware of Mr. Menaker's unlawful conduct.

83. As alleged herein, Hofstra was aware that Mr. Menaker's conduct had caused, and would continue to cause, Plaintiff harm.

84. Hofstra retained Mr. Menaker as an employee for an unreasonable length of time after learning of the unlawful conduct and the harm it was causing Plaintiff.

85. Mr. Menaker's unlawful conduct occurred during the course of, and within the scope of, his employment with Defendant.

86. As a result of Defendant's negligent retention of Mr. Menaker, Plaintiff suffered harms including extreme emotional distress.

## DEMAND FOR JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues triable by jury in the above-captioned civil action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that the Defendant engaged in unlawful discrimination and retaliation under Title IX as well as negligent supervision and negligent retention under New York law;

B. Awarding damages to Plaintiff for all economic and non-economic injuries she has suffered as a result of Defendant's unlawful conduct;

C. Awarding Plaintiff punitive damages to punish the Defendant for its unlawful conduct;

D. Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of this action;

E. Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy the Defendant's unlawful conduct.

Dated: New York, New York
October 19, 2018

**PHILLIPS & ASSOCIATES, PLLC**

_____
Parisis G. Filippatos, Esq.
Siobhan Klassen, Esq.
45 Broadway, Suite 620
New York, NY 10006
Tel: (212) 248-7431
Fax: (212) 901-2107
Pfilippatos@tpglaws.com
Sklassen@tpglaws.com